**Richard M Sobel, MD, MPH**
**101 Passage Point**
**Peachtree City, GA 30269**

July 31, 2019

Bob Blakemore
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119

**RE:  Estate of Wayne Bowker (deceased) v Chris Bryant (Sheriff Bryant), et. al.**

Dear Mr. Blakemore:

This report outlies my assessment and opinions regarding the medical care or lack thereof Wayne Bowker received or should have received at the Carter County Jail ("the Jail"), Center during March through June of 2016.  Thus far, I have reviewed:

1.  The Complaint: Prince (Wayne Bowker v Bryant Sherriff of Carter County. Case NO. 18-cv-201-RAW;

2.  Manos Case: Response and Exhibits;

3.  CCSO jail inmate medical file on Wayne Bowker Redacted, CCSO Jail log for 3-23-16 through 4-20-16; CCSO Jail log for 4-21-16 through 5-10-16 CCSO Jail log for 5-11-16 through 5-31-16, CCSO Jail log for 6-1-16 through 7-1-16;

4.  Photos of Cell B-107

5.  CCSO inmate medication logs for Wayne Bowker;

6.  CCSO Jail Pharmacy Purchase Orders Feb 2016 to Aug 2016;

7.  CCSO radio log record for 6-30-16;

8.  CCDC P&P Manual;

9.  Inmate Videos: Video: 07_160629102700_2101_4000_00_57.n3r,
    Video: 08_160629102700_2101_4000_00_57.n3r,
    Video: 09_160629102700_2101_4000_00_57.n3r,
    Video: 11_160629103900_0301_4000_00_57.n3r;

10. 11-27-18 Documents Produced by Mercy (1-3407) (17409);

1

11. Copies of Radiology studies

12. Wayne Bowker Death Certificate

13. Wayne Bowker Medical Examiner Report;

Before proceeding, I will briefly outline my professional background.  Please refer to my attached *Curriculum Vitae*.  I received a MD degree from New York Medical College in 1980.  I trained in Internal Medicine/Primary Care at the University of Maryland Hospital in Baltimore, MD 1980-1981.  I completed a residency in Emergency Medicine at Emory University/Grady Memorial Hospital in Atlanta, Georgia in 1984.  I obtained a Master's in Public Health from the Johns Hopkins School of Public Health receiving a United States Public Health Fellowship in 1982.  I am Board Certified in Emergency Medicine by the American Board of Emergency Medicine and have been since 1986.  I have practiced emergency medicine for more than three decades in a wide spectrum of emergency departments.  I have been involved in the medical care of inmates for three decades both as an emergency physician and previously as a provider of primary care to inmates during their incarceration.  I am in active practice as an emergency physician at a busy emergency department in the Atlanta Metropolitan area.

I am familiar with the general standards of care for providing and administering medical care to inmates.  I recognize that the failure to provide incarcerated individuals with ample continuity of medical care and access to prompt medical services for emergency medical conditions is below medical and institutional standards.  I understand that deliberate indifference to serious medical needs of prisoners may constitute an "unnecessary and wanton infliction of pain" and thus violate an inmate's constitutional rights as described by 42 U.S.C. §1983 and other US Statutes.

I am familiar with the treatment of acute and chronic psychiatric conditions.  I have provided care and stabilization to countless patients suffering from acute psychosis and decompensation of psychiatric disorders.

Deposition testimony specifically taken for this this matter is yet pending. However, to the degree that answers given during the Manos proceed were responsive to the care that Mr. Wayne Bowker received in the CCSO Jail, my opinions are formulated to a reasonable degree of medical certainty.

**Factual Summary**

Wayne Bowker (Mr. Bowker, the "inmate" or "the patient") was incarcerated at the Carter County Detention Center ("CCDC" or "the Jail") on March 23, 2016. When Mr. Bowker arrived at the Jail, he was well able to accomplish his activities of daily living.  He was fully ambulatory and able dress and feed himself and correspond in writing.  Based on information reviewed, Mr. Bowker was not involved in any altercations at the Jail nor did he suffer any known traumatic injury there.  Mr. Bowker unexpectedly died in a holding cell on June 30, 2016 at CCDC.

2

Mr. Bowker had a past medical history significant for anxiety and bipolar disorder, seizures, dyslipidemia, hypertension, thyroid disorder, asthma, obstructive sleep apnea and congestive heart failure. Consequently, he was prescribed an associated regimen of medications. He was prescribed various medications and a Continuous Positive Airway Pressure (CPAP) machine at night.

Mr. Bowker completed a standard inmate intake medical questionnaire upon his booking at CCDC. His intake medical history form documents Mr. Bowker's medical issues and describes prior treatment for the above disorders. According to a deposition[1] given by Kimberlee Miller, RN, the nurse entrusted by CCSO to oversee medical management of inmates, she did not routinely review inmate medical intake data nor their medication for appropriateness with a medical provider or their medicine administration records. She further admitted that there was no medical provider in place to provide continuity of medical care for inmate for the inmate population. Instead, when an inmate was perceived to have acute or urgent medical needs, to the extent any care was provided at all, they would most often be sent to the emergency department. Upon their return to the jail, there was no medical provider to review their records or recommendations for further medical care.

While emergency physicians are called upon to provide primary care by default, emergency departments are not structured to provide continuity of care for patients. A reliance on emergency department to deliver routine primary is clearly inappropriate and represents a denial of continuity of medical care to inmates.

Nurse Miller also testified to her obligation to review, document and create inmate related medical records. Her perceived obligation was so minimum that inmates were further deprived of their right to have their medical records available to other medical for future review. This equates to another violation by CCSO and their CCDC nurse to maintain inmate health records.

According to an Oklahoma State Bureau of Investigation (OSBI) report conducted after Mr. Bowker's death, on June 3, 2016, Mr. Bowker complained of dizzy spells and loss of balance. He was also experiencing edema (swollen feet) and complained that his legs felt weak. Mr. Bowker was morbidly obese with obstructive sleep apnea. These type symptoms required on-going monitoring and medical management. There was no continuity of medical care provided to Mr. Bowker. Therefore, such acute symptoms could not be, and were not, properly medically managed.

On June 5, 2016, Mr. Bowker was transported to emergency department of Mercy Hospital in Ardmore, OK for evaluation. The hospital staff suspected he was suffering from an anti-psychotic medication adverse effect (akathisia, a movement disorder). The emergency physician recommended reducing Mr. Bowker's psychiatric medication. After he was returned to

---

[1]     The deposition of Nurse Miller was taken in the "Michael Manos" case, a related and similar case involving allegations of deliberate indifference to serious medical needs at the CCDC.

the Jail, and despite a reduction in his said medication, Mr. Bowker's symptoms persisted. This was never properly reassessed by any medical provider at the Jail.

Mr. Bowker was seen in the emergency department at Mercy Hospital on June 11, 2016. It was still suspected a movement or balance disorder. No other specific diagnosis was made. On June 11, 2016 Mr. Bowker returned to the Jail. No further medical evaluation occurred until his post-mortem evaluation.

Mr. Bowker returned to his cell in the B-Block in general housing with other prisoners. Apparently, Mr. Bowker's mobility progressively declined. Other inmates helped him get up off his mat, clean up his cell, and thus, with activities of daily living. These inmates assisted with the administration of breathing treatments. According to the CPAP software data, Mr. Bowker stopped using his CPAP several days prior to his death. A morbidly obese patient with sleep apnea may be medically dependent on continued CPAP utilization.

By June 27, 2016, Mr. Bowker was unable to perform his activities of daily living; he was found to have repeated fecal incontinence; he had lost mobility; and, he was largely non-communicative. His behavior was unsafe, inappropriately removing his clothes and laying on his cell floor for hours at a time. He was observed covered in his own feces and staring out into space. Within reasonable medical certainty, Mr. Bowker was experiencing a malignant catatonic state. Catatonia may be "malignant" and thus result in death. Mr. Manos, another CCDC inmate experienced malignant catatonia and died of pulmonary embolism and likely multiple pressure ulcers and other expected medical complications. Malignant catatonic is a well treatable condition that rarely results in death when the patient receives medical management on a timely basis. Neither, Mr. Manos nor Mr. Bowker received any medical management of their malignant catatonia.

It required days for CCDC personnel to meaningfully move the inmate to an observation cell on H-Block. However, he was not placed in medical observation. According to Nurse Miller, she did not evaluate him nor did corrections officers (COs) inform her of his status or deteriorating health. Mr. Bowker was placed in a "suicide gown". Officer Carrie Cargil is reported to Deputy Miller that Mr. Bowker had not been eating. On June 29, 2016, Nurse Miller, had just returned from vacation. If she evaluated Mr. Bowker, she failed to refer him for emergency evaluation as the standard of care required. The inmate was inadequately responsive consistent with an acute psychosis and a catatonic state. Mr. Bowker was not appropriately responding to CO staff, repeating "I can't. I can't."

Despite conspicuous evidence of abnormal behavior associated with acute psychosis, catatonia and other emergency medical conditions, neither Nurse Miller or CO staff called for transport of the inmate for emergency care or even a psychiatric evaluation. Nurse Miller disregarded the conspicuous risk of harm of Mr. Bowker due to his declining state, ostensible helplessness and unacceptable hygiene and relative immobility.

Upon interview with OSBI, Nurse Miller stated that Mr. Bowker was moved to H-Block not due to health concerns, but because of fellow inmates' complaints. Despite Mr. Bowker's known psychiatric history and current treatment and repeated fecal incontinence and/or smearing

4

feces on himself, Nurse Miller and the CO staff failed to act consistent with common sense.  It was wrongly suspected that Mr. Bowker was somehow "faking" his condition. Nurse Miller and/or CO or agents of CCSO presumed that they were qualified to make a medical diagnosis, that is, malingering.  Either that or they recklessly dismissed the risk of harm when an inmate has a conspicuous acute exacerbation of psychiatric illness.  Neither Nurse Miller or the COs or any agent of CCSO had proper qualifications to diagnose Mr. Miller with malingering.  Indeed, it was not the case. CCSO recklessly disregarded the limitations of the scope of practice of a nurse or the knowledge a prudent layperson could be expected to have.  CCSO presumed that Mr. Bowker's helplessness, inability to perform activities of daily living and lack of personal hygiene were due to a plan for secondary gain, that is, malingering.  Within reasonable medical certainty, Mr. Bowker was suffering from various emergency medical condition(s), to include malignant catatonia which was present within reasonable medical certainty.

By June 29, Mr. Bowker had been immobile on the ground for enough time to cause bruising of his shoulder. He was additionally found to have white secretions around his mouth. Detention officers Terry Miller and Chester Carter brought Mr. Bowker to shower. Rather than caring for himself, Mr. Bowker repeatedly stated, "I can't. I'm stuck. I'm scared." He was obviously incoherent and/or delirious. Jailers apparently assisted Mr. Bowker from the shower. Nurse Miller brought him a toothbrush.  However, he was completely unable to care for himself.

After the above incident, Nurse Miller called Judge Carson Brooks and discussed Mr. Bowker's behavior.  Judge Brooks mentioned that Mr. Bowker had appeared at previous hearings and seemed to be amply coherent. Nurse Miller could have had no rational medical explanation for the inmates deteriorated condition regardless if she had an opinion that the patient was malingering.  Judge Brooks could not be expected to make a medical or nursing diagnosis, nor could agents of CCSO expect or rely on him to do so. CCSO and its agents recklessly disregarded the inmates right of access to emergency care and stabilization.

Thus, Mr. Bowker did not receive the emergency medical and/or psychiatric evaluation that was conspicuously required.  It appears the nurse and jailers were so resolute in their prejudicial judgments that Mr. Bowker would not be sent for emergency medical evaluation that they downgraded his status from an observation cell in CCDC H-Block and returned him to an individual cell in B-Block.  This is another example of deliberate indifference to the risk of harm to an inmate suffering from a conspicuous emergency medical condition(s).  There was wanton disregard for the conspicuous need for medical/psychiatric screening and diagnosis that existed at this time.

On June 30, 2016, at 1:02 AM, Deputy Danny Renken conducted his rounds and a site check of Mr. Bowker's cell. Mr. Bowker was sitting on the commode.  He was reported to be staring into space. The inmate's behavior should have easily been recognizable by any prudent layperson of mental decompensation or derangement. Mr. Bowker continued to suffer from a catatonic state and its predictable medical complications. According to Nurse Miller's testimony, COs did not properly communicate with her regarding Mr. Bowker's condition.

Deputy Renken did not initiate a request for timely access to the 911 system for Mr. Bowker's despite his deteriorating condition prior to his cardiac arrest.  Mr. Bowker's mental health and ability to provide self-care and hygiene had progressively deteriorated over the preceding week.  By the time he was placed in observation, the conspicuous jeopardy to his health should have been obvious.  At 2:09 AM, Deputy Renken conducted another site check. He found Mr. Bowker lying on the floor face down near the cell door. By then, Mr. Bowker was flaccid and cool to the touch.  He was found to be without a pulse or respirations by Deputy Renken who radioed Sergeant McDaniels. When Sergeant McDaniels arrived, he rolled Mr. Bowker over revealing that Mr. Bowker had vomited and possibly aspirated. Sergeant McDaniels initiated CPR after he retrieved a mask from the guard tower.  It so appears that CPR was not appropriately initiated for Wayne Bowker when Deputy Renken who had prior CPR training been despite his recognition that it was required.  Chest compression should have been initiated immediately; no equipment is required to do so.

Deputy Renken radioed the communication tower and requested that the tower officer contact the Southern Oklahoma Ambulance Services (SOAS).  However, this was too late to have any impact on Mr. Bowker's opportunity for survival.  SOAS medics Joshua Morgan and Sarah Beth Johnson arrived, placed Mr. Bowker on a gurney, and provided CPR.  The resuscitation efforts continued, and paramedics transported Mr. Bowker to Mercy Memorial Hospital.  He was pronounced dead at 2:55 AM by Dr. Sang Lee.

**Medical Examiner's Report**

Wayne Bowker received a post-mortem examination after unexpected death while incarcerated at CCDC. The Medical Examiner indicated that Mr. Bowker's death was associated with cardiomegaly, an abnormal enlargement of the heart. I have been a forensic reviewer of autopsy reports for more than 20 years.  My medical training, forensic practice and experience qualifies me to opine as to the interpretation and relevancy of the autopsy findings.  When called to testify, I will explain that cardiomegaly is a common medical condition.  I diagnose cardiomegaly on a routine basis in patients that are fully ambulatory, stable and appropriate for out-patient management.  In fact, no emergency treatment is specifically indicated for generic cardiomegaly.  In Mr. Bowker's case, cardiomegaly did not cause his death.

In my opinion, Mr. Bowker's autopsy report does not identify a specific cause of his death. This is not rare. Cardiomegaly was an incidental finding on autopsy.  It should not be assumed to be the proximate cause of the inmate's demise.  In my opinion, the pathologist is basically listing it as an anatomical diagnosis.  In cases where cardiomegaly is directly associated with death, it is generally associated with severe congestive heart failure and/or a severe dilated cardiomyopathy which are not seen here.  Such cardiomegaly is much more severe than found on Mr. Bowker's autopsy report.  In cases of severe cardiomegaly, the patient's ejection fraction is low and there is often significant pulmonary edema.  A pathologist will find dilatation of the ventricle and diagnose a dilated cardiomyopathy.  Patients with a dilated cardiomyopathy can die of heart rhythm disturbances such as a ventricular fibrillation.  However, the postmortem exam of Mr. Bowker does not indicate that he suffered from a dilated cardiomyopathy.

Death of a patient with malignant catatonia may be associated with several pathologies such as pulmonary embolism in Mr. Manos' case. Other causes include overwhelming infection and multiple organ dysfunction. Electrolyte disturbances may occur associated with severe dehydration and kidney failure. Rhabdomyolysis (muscle breakdown) is associated with prolonged periods of immobility. Mr. Bowker was indeed likely to be substantially dehydrated by the time of his death. Electrolyte disorders, acidosis, kidney failure is probable. These and other medical problems are all predictable consequences of untreated malignant catatonia, a condition that Mr. Bowker suffered within a reasonable medical certainty. Notwithstanding the general survivorship with medical treatment and supportive care of patients with malignant catatonia is very favorable and death exceedingly rare thereof. However, with neglect, malignant catatonia has a high risk of poor outcomes.

Mr. Bowker had several other medical conditions that could have contributed to his demise. As he was previously diagnosed with asthma and OSA (obstructive sleep apnea) related complications may occur with medical neglect particularly in a patient with malignant catatonia. These conditions may cause hypoxia (lack of adequate oxygen) and hypercapnea (buildup of $CO_2$). Both these conditions may lead to respiratory failure. If Mr. Bowker was not receiving his nebulized asthma treatment and CPAP, he would be at risk for death due to respiratory failure. There is no documentation that Mr. Bowker was receiving standard care for his known medical conditions, to include asthma and OSA. His MAR indicates that no medication was given for many days prior to death. His CPAP machine records also indicate a lack of use for days prior.

Mr. Bowker likely suffered prolonged immobilization on the jail floor. Thus, he would likely suffer rhabdomyolysis (muscle breakdown) which may lead to kidney failure if untreated. Untreated catatonia itself is associated with rhabdomyolysis. Rhabdomyolysis may cause death via several mechanism without medical attention. With treatment, it is rarely fatal.

Malignant Catatonia, previously termed "lethal catatonia," is the most severe manifestation within the spectrum of catatonic syndromes. Catatonia is characterized by immobility, rigidity, mutism, posturing, excessive motor activity, stupor, staring and other psychiatric disturbances. Malignant Catatonia is a life-threatening illness that can develop in the context of a psychiatric syndrome or general medical illness in psychiatric patients. I have treated many patients diagnosed with catatonia. It is my opinion that Wayne Bowker suffered from catatonia which became lethal due to medical and psychiatric neglect.

Catatonia is typically stabilizable by supportive medical care. In addition, pharmacological and other psychiatric treatments and procedure are known to be of benefit. I have never personally or known a patient to die from catatonia. Considering the findings of autopsy report of Wayne Bowker, it is my opinion that he would not have died had he received standard medical, psychiatric and emergency care during his incarceration or via transfer to an appropriate medical facility. In addition, and within reasonable medical certainty, Mr. Bowker would have returned to his baseline state of health had he received the access to continuity of care and emergency care prior to June 30, 2016. Instead, a conspicuous risk of death of this inmate was wantonly disregarded by the staff of Carter County Detention Center and he expired.

The Medical Examiner's report indicates that olanzapine, an anti-psychotic agent, was detected in Mr. Bowker's blood. The autopsy report spectrophotometry analysis failed to reveal the presence of other drugs or medications in Mr. Bowker's blood. This would indicate that Mr. Bowker did not receive or did not/was unable to take other medications previously prescribed. If any inmate is refusing his medicine, this must be documented by Jail staff, in this case, COs of Carter County Detention Center. The available medication administration record (MAR) by which a jail or prison maintains records of inmate medication administration is required by standards of care for incarcerated persons. The standards of care require that healthcare personnel monitor inmate medication administration with oversight from a medical provider or pharmacist who communicates with a provider as necessary.

The dates covered by the MARs I have reviewed are restricted to 5/13/16 through 6/30/16. I find that Phenytoin, an anti-convulsant, was administered until 6/11/16 and no further record beyond. Olanzapine, an anti-psychotic, was administered from 5/13/16until 6/29/16. Atorvastatin was administered between 5/13/16 and 6/29/16 when it is documented that Mr. Bowker refused this medication. Levothyroxine, a thyroid replacement medication, was given between 5/13/16 and 6/12/16. Metoprolol, an anti-hypertensive medication was given between 5/13/16 and 6/11/16. Nurse Miller testified in her deposition in the Manos case that COs were found to be "pre-flighting" MAR. This violated standards and they were admonished per her deposition. It is not yet known if "pre-flighting" occurred in Mr. Bowker's case. What is known is that no medical provider provided any routine oversight on medication administration to inmates of the CCSO. Furthermore, Nurse Miller testified that it was not her responsibility to review MARs nor review findings with a medical provider. The requirement for MAR oversight in a corrections institution setting is obvious and indisputable. CCSO and/or its agents had reckless disregard for these standards. In Mr. Bowker's case, this was a substantial contributory cause of his death. Obviously, non-compliance with medication is not consistent with proper health maintenance in a jail setting. It is common in catatonic patients and can be associated with adverse medical outcomes, as it was in Mr. Bowker's case within reasonable medical certainty. Clearly, multiple medications were refused or discontinued during the month of June 2016. The failure to provide an oversight of medication administration to Mr. Bowker by CCSO was recklessly indifferent to the risk of harm.

The fact is that Mr. Bowker's post-mortem report did not document medications other than olanzapine in his bloodstream. This indicates that he was not taking or was not given several routine medications. CCDC is required to maintain a MAR. When inmates refuse or do not receive prescribed medication, the MAR must document discontinuance or refusal. The available MAR records do not meet this basic standard. As I have indicated above, when an inmate refuses chronic medication or is unable to take them due to catatonia, these events must be brought to the attention of a responsible medical provider. The physician or midlevel provider will then determine the medically reasonable course of action. An inmate must be medically assessed on a timely basis. Specifically, when an inmate, such as Wayne Bowker, is unable to take their routine medications and their physical or psychiatric condition is deteriorating, the associated risk(s) to their health must be assessed by qualified medical professional. In this case, the nurse, jailer(s) and/or agents of CCDC failed to recognize the need

for general medical oversight of Mr. Bowker's medications. They disregarded the potential consequences of medication non-compliance in a catatonic patient with deliberate indifference.

Further discovery testimony may be helpful to my analysis of this matter. However, based on the available information, CCDC did not properly maintain and report the patient medication administration record to a responsible medical provider. In fact, no such medical provider existed or was contacted. The jail nurse claimed that oversight of the inmate's medication was not part of her routine. The information reviewed from the case of Jeanne Bennett (Michael Manos) v Carter County Board of County Commissioners indicates that CCDC failed to provide inmates with any care by a medical provider responsible for inmate medical care during his incarceration.

The above is indicative of a wanton and deliberate indifference to the risk of harm to Mr. Bowker, an inmate with serious psychiatric and medical conditions.

### Summary breaches of Medical and Corrections Institutional Standards

There was apparent lack of qualified continuity of medical care for Wayne Bowker while he was incarcerated at CCDC. It is suspected that the following breaches were emblematic and probably systemic for the institution based on information in the Manos matter. CCDC and its agents, the nurse and correctional officers failed to facilitate any reasonable continuity of medical by a qualified medical provider. They failed to summon or access emergency medical care on a timely basis in the face of deteriorating and even grotesque inmate condition. They failed to attempt to procure an urgent mobile or otherwise psychiatric evaluation for Mr. Bowker after his discharge from Mercy Hospital on June 15, 2016 despite conspicuous deterioration of his mental health. They failed to properly administer CPR.

Wayne Bowker had a conspicuous need for medical management of multiple physical and psychiatric conditions. Indeed, several emergency department evaluations occurred during the month of June. I do not find any evidence of continuity of medical care for asthma, COPD, sleep apnea, history of congestive heart failure, thyroid disease, hypertension or any medical condition. These conditions require timely medical reassessment upon discharge and reincarceration. Frequent vital signs and medical reassessment may be required until a stable medical regimen is presumed. Allowing an inmate's medical and/or psychiatric condition to decompensate and simply return them to the emergency department for stabilization does not meet the minimal standard for continuity of medical management of an inmate. When Mr. Bowker stopped taking various medications no interventions apparently occurred.

In Mr. Bowker's case, as his condition deteriorated, the lack of continuity medical care deprived him of his basic right to access to medical care and ultimately emergency stabilization of his medical and psychiatric condition(s). Catatonia is a medical emergency with a conspicuous risk of harm or death if untreated. CCDC and its agents recklessly disregarded the need to provide this inmate with continuity of medical care and access to emergency medical screening and stabilization with deliberate indifference. This could not be overcome by episodic nursing assessments if they did even occur (and there is no indication that they did).

Based on the available information CCDC and its agents recklessly disregarded the need to  monitor an inmate's administration and compliance with medications.  Based on the autopsy result of a finding of a single medication in Mr. Bowker's bloodstream and the available MARs, not even slight diligence with the monitoring of medication compliance for inmates by the Institution apparently existed.

If an inmate is unable or unwilling to take his medications, CCDC must document and monitor this and refer such information to a medical provider.  If CCDC presumed that they rely on a nurse for medical care, they did not even procure coverage while Nurse Miller was on vacation.  This would be equivalent to virtual lack of a medical system designed to provide inmates with medical care.  Obviously, this is deliberately indifferent to an inmate's right to medical care while incarcerated.

As Mr. Bowker's physical, mental and hygienic status conspicuously deteriorated, CCDC and its agents recklessly disregarded the risk of harm to the inmate.  To what degree the agents of CCDC may have rationalized their apparent neglect of the inmate due to an attribution of malingering to the inmate is currently not known.  However, the inescapable fact is that Mr. Bowker was not malingering.  Furthermore, the attribution of a medical diagnosis, that is malingering, to Mr. Bowker could not be made by unlicensed medical personnel; A nurse cannot properly diagnose malingering because they cannot formulate a medical diagnosis or differential diagnosis.  Nurses are taught not to make medical diagnoses.  As such, the improper application of a diagnosis of malingering to Mr. Bowker was not only wrong but also recklessly indifferent and wantonly neglected the inmate's urgent need for medical and psychiatric evaluation and stabilization.  It is unknown to what degree this prejudice was applied to other inmates at CCDC but Mr. Manos may be another case on point.  What is known, is that CCDC deployed a nurse and improperly trained corrections officers that persistently labored under the assumption that they could make a medical diagnosis of "malingering".  This represented deliberate indifference to the risk of harm to the inmate should they be wrong.  Indeed, this was an apparent substantial contributory cause of his death due to untreated malignant catatonia.

The nurse and corrections officers of CCDC knew or should have known that no qualified primary care provider was engaged for any inmate at the time of Mr. Bowker's medical deterioration and death.  In my opinion, more likely than not and within reasonable medical certainty, a prudent jail medical professional or mobile psychiatric provider would have diagnosed acute or worsening psychosis or catatonia in a known schizophrenic psychiatric patient like Mr. Bowler who was smearing feces, largely non-communicative and relatively non-communicative and immobile. Any prudent layperson should be capable of recognizing the high likelihood of the presence of psychiatric decompensation under the circumstances; Mr. Bowker had a known psychiatric history and grossly apparent mental deterioration.  A prudent nurse would also understand that an inmate, Wayne Bowker, who cannot perform his activities of daily living must have medical clearance and psychiatric evaluation and stabilization.  Thus CCDC, its nurse and corrections officers were deliberately indifferent and wantonly neglected the inmate's progressive physical and mental deterioration and his obvious need for medical and psychiatric evaluation and stabilization.  As such, he remained at the Jail until his catatonia literally became

lethal.  This would not have otherwise occurred within reasonable medical certainty had basic jail standard for healthcare been upheld.

Nurse Miller was the apparently the only trained healthcare professional at the Jail. CCDC seems to have wrongfully accepted that a nurse could provide medical care to inmates; the Institution consciously disregarded the federal requirement to provide medical care of its inmate's healthcare like to what there is available in the community standards within constitutional obligations.  I am not providing a legal opinion, but continuity of medical care for inmates is standardly required in the United States of America.  A nurse cannot provide medical care to inmates or make medical diagnoses; obviously, they provide nursing care only unless they have an advanced degree not held by Kimberly Miller.  During Mr. Bowker's incarceration and probably for years, there was an absence of a covering physician responsible for inmate healthcare.

Nurse Miller and the CCDC COs consciously disregarded the absence of continuity of healthcare by a designated medical provider or any apparent on-board medical care for with deliberate indifference. They further neglected the knowledge a prudent layperson would have by not providing Mr. Bowker access to urgent or emergent psychiatric evaluation when his mental health and physical condition deteriorated to the point that he could no longer manage his activities of daily living.  They stood idly, witnessing medically unsafe hygienic conditions for the inmate. This was deliberately different to the risks of harm to Wayne Bowker.

Nurse Miller testified in the Manos matter that if an inmate were to exhibit signs of a serious mental illness, such as psychosis or catatonia, she would hope that a CO would report this her; she would send the inmate to an emergency department (ER) for evaluation.  This obviously did not occur in the face of a Mr. Bowker's catatonic state.  Mr. Manos apparently died under similar such circumstances.  This is confirmatory of a systemic problem at CCDC.

Nurse Miller reportedly worked 8:00 a.m. to 4:00 p.m. Monday through Friday.  When she was not at the Jail, corrections officers (COs) were to notify a guard at the tower if they decided an inmate was suffering from a severe medical condition. The tower guard was to send a text message to Nurse Miller and then await instructions. Based on information received, COs were not ordinarily empowered to call an ambulance for an inmate without notifying Nurse Miller.  This would be dissimilar to community standards for accessing 911.  This process would be inconsistent with reasonable access to emergency care when a prudent layperson would be able to suspect an emergency medical condition.  This can be and was deliberately indifferent in Mr. Bowker's case; the inmate had reasonably conspicuous evidence of an emergency medical condition for hours to days prior to his demise.  The CCDC's process for accessing 911 is thus deliberately indifferent to the risk of harm if a patient should be suspect of having an emergency medical condition.  A delay of several minutes to even hours in accessing 911 can adversely affect patient outcomes.  Many emergency medical conditions require stabilization that is time dependent in application.

In contradistinction to the above operation, the CCDC Manual has a policy and procedure regarding medical emergencies. The manual lists nine occurrences, any one of which shall

constitute a medical emergency.  These require COs to initiate their Emergency Medical Care Plan.  One of these circumstances is a "sudden onset of bizarre behavior."  When an inmate is unable to perform his activities of daily living, is immobile on a jail floor long enough to cause pressure induced bruising, is non-communicative or incoherent, defecating on himself and otherwise catatonic, this is obviously bizarre behavior. Even in the face of Mr. Bowker's obvious deterioration, no one at the Jail initiated an Emergency Medical Care Plan for the inmates conspicuously "bizarre behavior" and progressive mental deterioration and catatonia.

In case of a medical emergency, CCDC's official "Emergency Instructions" mandate that a shift supervisor: a. contact an ambulance to transport the inmate to the hospital; or b. contact dispatch to call a Deputy for transport; or treat the inmate at the facility in accordance with medical orders; or d. notify the medical officer if not in the facility. Jail staff failed to take any of these steps for Mr. Bowker.  It is certain that some of these options did not exist at the time of Mr. Bowker's incarceration.  Based on information I have received, CCDC did not employ a licensed physician at the time of Mr. Bowker's death.   Thus, Nurse Miller had no ongoing supervision.  Mr. Bowker was essentially pre-empted from receiving access to emergency care for days prior to his death by the staff and agents of CCDC.

Even at the time of discovery of Mr. Bowker's unresponsive condition, neither the Deputy or the Sheriff's Officer initiated CPR or accessed 911 on a reasonable and timely basis. This was particularly egregious after their recent failures and deficiencies; this reflects deliberate indifference not only to the inmate's conspicuous need for emergency medical care and resuscitation but also to the gross errors in judgment made prior to Mr. Bowker's demise.

It is my opinion there is a reasonable probability that CCDC, and/or its agents, recklessly disregarded and were wantonly, consciously and/or deliberately indifferent to Mr. Bowker's deteriorating mental and physical condition.  Within reasonable medical certainty, Mr. Bowker suffered an acute psychiatric decompensation and catatonia that became lethal due to the above failures to provide inmate psychiatric and medical care and access to emergency services.

It is my opinion to a reasonable degree of medical certainty, that if access to primary qualified inmate medical care, psychiatric evaluation and/or emergency medical care was provided to Mr. Bowker before June 30, 2016, standard medical treatment would  more likely than not been effective; the patient would have survived and not suffered unnecessary pain and untimely death that otherwise occurred due to the breaches of inmate healthcare I have described in this report.

I reserve the right to supplement my opinions, or to amend them as necessary, upon review of additional records, deposition testimony or expert reports.


Respectfully submitted,


*RSobel, MD*

Richard M. Sobel, MD, MPH

**Richard M. Sobel, MD, MPH**
**101 Passage Point**
**Peachtree City, Georgia 30269**

**EDUCATION**

**B.A.**, Genetics, Innovational Projects Board
State University of New York,
Binghamton, New York, 1976

**M.D.**, New York Medical College
Valhalla, New York, 1980

**M.P.H.**, Johns Hopkins University
School of Hygiene and Public Health,
Baltimore, Maryland, 1982

**Internal Medicine/Primary Care**
University of Maryland Hospital,
Baltimore, Maryland, 1981

**Emergency Medicine**
Emory University/Grady Memorial Hospital,
Atlanta, Georgia, 1984

**CURRENT CLINICAL POSITION**

**Emergency Physician**
Southern Regional Medical Center
Riverdale, Georgia, 2001-2002, 2008-present

**PREVIOUS POSITIONS**

**Medical Director Emergency Department**
Jasper Memorial Hospital
Monticello, Georgia, 2005-2009

**Emergency Physician**
Emory University
Department of Emergency Medicine
Grady Memorial Hospital
Atlanta, Georgia, 1999-2005

**Emergency Physician**
Houston Medical Center
Warner Robins, Georgia, 2002-2009

**Emergency Physician**
South Fulton Medical Center
East Point, Georgia, 2001-2002

**Regional Medical Director**
PhyAmerica Physician Group
Augusta, Georgia, 1996- 2000

**Medical Director Emergency Department**
Emory Peachtree Regional Hospital
Newnan, Georgia, 1996 - 2000

**Clinical Associate Professor**
Division of Emergency Medicine,
University of Florida College of Medicine,
Medical Director of Emergency Department and
ShandsCair Emergency Medical Services,
Shands Teaching Hospital at the University of Florida,
Gainesville, Florida, 1996 - 1997

**Regional Medical Director**
Southeastern Emergency Physicians,
Knoxville, Tennessee, 1992-1996

**Medical Director**
Emergency Departments and Hospitalist Service,
Columbia Regional and East Montgomery Medical Centers,
Montgomery, Alabama, 1992-1996

**Medical Director**
Emergency Department,
South Seminole Community Hospital,
Longwood, Florida, 1991-1992

**Medical Director**
Emergency Department,
Winter Haven Hospital,
Winter Haven, Florida, 1988-1990

**Attending Physician**
Emergency Medicine Residency Program,
Orlando Regional Medical Center,
Orlando, Florida, 1986-1990

**Associate Director**
Emergency Department,
University Hospital,
Augusta, Georgia, 1985

**Clinical Director**
Emergency Medical Services and Emergency Department,
Medical Center of Central Georgia,
Macon, Georgia, 1984-1985

**FACULTY APPOINTMENTS**

**Assistant Professor**
Emory University
Department of Emergency Medicine
Grady Memorial Hospital
Atlanta, Georgia, 1999-2005

**Clinical Associate Professor**
Division of Emergency Medicine,
University of Florida College of Medicine,
Medical Director of Emergency Department and
ShandsCair Emergency Medical Services,
Shands Teaching Hospital at the University of Florida,
Gainesville, Florida, 1996 - 1997

**Clinical Instructor**
University of Alabama at Birmingham
Montgomery Internal Medicine Program
Montgomery, Alabama 1992-1996

**Attending Faculty**
Emergency Medicine Residency Program,
Orlando Regional Medical Center,
Orlando, Florida, 1986-1990


**PROFESSIONAL SERVICE, AWARDS AND COMMITTEE APPOINTMENTS**

**Editorial Consultant**
*The American Journal of Emergency Medicine*
W.B. Saunders
The Curtis Center, Independence Square West
Philadelphia, PA 19106, 2002-2019
Certificate of Outstanding Contribution in Reviewing
Elsevier 11/2016

**Peer and EMTALA Reviewer**
Georgia Medical Care Foundation
Composite State Board of Medical Examiners
Atlanta, GA, 1997-present

**Region III EMS**
Excellence in Trauma Care Award
Clayton County, GA, 2012

**Office of the District Attorney**
Clayton Judicial Circuit, GA
Professional Service Medal
Jonesboro, Georgia
Forensic Testimony, 01/24/17

**Peer Reviewer**
State of Alabama
Board of Medicine
Montgomery, AL, 1994

3

**Medical Director, EMS**
Phoenix Air Ambulance Service
Griffin, Georgia, 2007

**Panel Chairman, Casualty Stabilization Committee**
US Army Medical Research and Materiel Command Workshop
Leesburg, VA, 2002

**Peer Reviewer**
Sterling Healthcare
Clinical Bulletin, State of the Art Emergency Medicine
Miami, Florida, 1996-98

**Peer Reviewer**
Journal of Drugs and Aging
Adis International
Mairangi Bay, New Zealand, 2002

**Medical Staff Committees**
Medical Executive, Quality Assurance and Pharmacy and Therapeutics Committees
Emory Peachtree Regional Hospital,
Newnan Georgia, 1996-2000

**Medical Staff Committee**
Quality Improvement
Department of Emergency Medicine
Grady Memorial Hospital
Atlanta, GA 2000-2005

**Principal Community Investigator,**
National Emergency Airway Registry
Brigham and Women's Hospital
Boston, MA, 1998

**EMS Medical Director,**
ShandsCair EMS
University of Florida, Shands Teaching Hospital
Gainesville, Florida, 1997

**Committee Member,**
State of Florida
Committee on Trauma, 1997- 1998

**Regional EMS Medical Director,**
Southeast Alabama EMSS, Inc.
Dothan, Alabama, 1992-1996

**Committee Member,**
State of Alabama, Division of EMS
Medical Control Committee, and Protocol Subcommittee,
Department of Public Health
Birmingham, AL, 1992-1996

**EMS Medical Director,**
Life Flight Air Ambulance Service
Montgomery, Alabama, 1992-1994

**Medical Director,**
Trenholm State Paramedic Program
Montgomery, Alabama, 1995-1996

**Associate EMS Medical Director,**
Emergency Medical Consortium
Seminole County, Florida, 1991-1992

**EMS Advisory Committee Member,**
Emergency Medical Services Physician Advisory Committee
Polk Co., FL, 1989-1990

**President,**
Citizen CPR, Inc.
Polk County, Florida, 1989-1990

**Fellow of the American College of Emergency Physicians, (FACEP)**
Dallas, TX, 1988.

**Medical Director,**
Central Georgia Poison Information Center
Macon, Georgia, 1984-1985

**Medical Director,**
Central Florida Poison Information Center
Winter Haven, Florida, 1988-1990

**EMS Physician Advisor,**
Emergency Medical Services Council
Bibb County, Georgia, 1984-1985

**Medical Director,**
Paramedic Program, Macon Vocational Technical College
Macon, Georgia, 1984-1985

**Medical Director EMS,**
Medical Center of Central Georgia
Macon, Georgia, 1985

**Medical Director EMS,**
Life Bird Air Ambulance Service
University Hospital
Augusta, Georgia, 1985


**LECTURES PRESENTED**

Diabetic ketoacidosis.
Department of Internal Medicine,
Medical Center of Central Georgia,
Macon, Georgia, 1986.

Cervical spine trauma.
Department of Surgery,
Medical Center of Central Georgia,
Macon, Georgia, 1986.

Cervical spine trauma
National Association of Medical Transcriptionists,
Winter Haven, Florida, 1988.

Quality assurance case studies.
Coastal Group, Inc.,
Regional Medical Directors Meeting.
Orlando, Florida, 1989.

Endocrine emergencies.
Meningitis: early diagnosis and treatment.
Renal emergencies: recognition and management.
The acute arthritities.
Traumatic asphyxia.
Reentrant tachycardia.
Pancreatitis in the emergency department.
Trauma to the pelvis:  emergency diagnosis and management.
Emergency Medicine Residency Program,
Orlando Regional Medical Center,
Orlando, Florida, 1987-1990.

Thrombolytic applications: interesting case studies.
Genentech Corporation,
Winter Park, Florida, 1991.

Community acquired pneumonia.
Pfizer Corporation,
Longwood, Florida, 1992.

Cardiopulmonary resuscitation: the state of the art, 1992.
Southern Regional Emergency Medical Services Conference.
Gulf Shores, Alabama, 1992.

Prehospital pacing: indications and protocol.
Southeast Alabama Medical Center,
Dothan, Alabama, 1992.

New dimensions in the management of cardiac arrest.
Department of Veterans Affairs Medical Center,
Tuskegee, Alabama, 1993.

Transcutaneous pacing.
Initial management of polytrauma.
Cardiopulmonary resuscitation.
Trauma resuscitation.
University of Alabama at Birmingham/Montgomery Internal Medicine Program,
Montgomery, Alabama, 1992-1994.

Advanced cardiac life support, update
Southern Regional Emergency Medical Services Conference.
Gulf Shores, Alabama, 1994.

University of Florida College of Medicine
Medical student orientation program
Emergency medicine career pathways,
Division of Emergency Medicine Lecture Series
Pediatric pneumonia: emergency diagnosis and management
Hypercalcemia-induced pancreatitis
Suture Skills Lab I & II
Rapid Sequence Intubation and Neuromuscular Blockade
Gainesville, Florida, 1997.

Gainesville/Alachua County Fire and Rescue Lecture Series
Violence in the field:  prehospital evaluation and management
Airway management in prehospital care,
Gainesville, Florida, 1997.

University of Florida College of Medicine
Physician's Assistant Program Lecture Series
Differential diagnosis of the acute abdomen,
Gainesville, Florida, 1997

Sterling Healthcare Group
Emergency Physician Documentation Seminar
Myths of emergency physician documentation,
Miami, Florida, 1998

Sterling Healthcare Group
Emergency Physician Documentation Seminar
Documentation: The physician's perspective,
Miami, Florida, 1998.

Phoenix AirCare
Aeromedical airway management,
Amiodarone, its place in prehospital care,
Griffin and Conyers, Georgia, 1999-2000.

Models of Emergency Physician Practice
Emory University,Department of Emergency Medicine,
Atlanta, GA, 2000

The Angry Joint, Diagnosis and Management in the ED
Emory University, Department of Emergency Medicine,
Atlanta, GA, 2002

Management of the Difficult Airway
Emory University CME Program
Clinical Excellence in EM,
Atlanta, GA, 2004.

Triage in emergency medicine
Jasper Regional Medical Center
Monticello, Georgia, 2005

EKG Interpretation: "Stratification" of the EKG in MI and ischemia
Emory University
Clinical Excellence in EM,
Atlanta, GA, 2005.

## BIBLIOGRAPHY

Sobel RM, Steck AR: Low dose ketamine in the age of opioids.
*American Journal of Emergency Medicine, 35 992-993 2017, March.*

Sobel RM, Wu, DT, Hester, K, Anda, K: Tissue plasminogen activator for transient ischemic attack: the case for "off-label" use of thrombolytics.
*American Journal of Emergency Medicine, 32 (3): 277–279, 2014, March.*

Randomized Controlled Trial of Ondansetron vs. Prochlorperazine in Adults in the Emergency Department
John Patka, PharmD; Daniel T. Wu, MD; Prasad Abraham, PharmD; Richard M. Sobel, MD, MPH
*Western J Emerg Med. 2011; 12(1):1-5, April.*

Sobel, RM.
Editor-in-chief and Senior Author
Challenger LLSA and ConCert Programs
Lifelong learning and self-assessment CME 2004-5
Challenger Corporation, Memphis, TN, 38134.

Sobel, RM.
Challenger/Rosen's Integrated Textbook
Contributing author, 2003
Challenger Corporation, Memphis, TN, 38134.

Sobel, RM, Donaldson, P, Dhruva NN: Pacemaker mediated tachycardia: Diagnosis and treatment by pacemaker interrogation in the ED.
*American Journal of Emergency Medicine, 20(4):336-9, 2002, May.*

Sobel, RM.
Contributing Author/Editor,
BioChallenger, Diagnosis and treatment of biological exposures, Feb 2000.
Challenger Corporation, Memphis, TN, 38134

Sobel, RM, Todd, K:  Risk factors for oligoanalgesia.
*American Journal of Emergency Medicine, 20(2):126, 2002, March.*

Sobel RM, Roth T:  Community-acquired pneumonia: current thoughts and management.
*Clinical Bulletin, State of the Art Emergency Medicine, 5 (3):1-16, 2000, Jan.*

Sobel RM:  CT Scans after post traumatic loss of consciousness.
*American Journal of Emergency Medicine, 19(4):91, 2001, July.*

Sobel RM:  Emergency physician ketamine administration complies with JCAHO regulations.
*American Journal of Emergency Medicine, 19(1):91, 2001, Jan.*

Block D., Lovelace P., Compliant documentation management for physicians, Vol. 1,
Physician Documentation CME Series, Editor, Sobel, RM.
Emory University School of Medicine and J.A. Thomas and Associates, Atlanta, GA, 2001.

Sobel RM, Dhruva NN:  Termination of acute wide QRS complex atrial fibrillation with ibutilide.
*American Journal of Emergency Medicine, 18(4):462-4, 2000 July.*

Sobel, RM.
Contributing Medical Editor, Cardiovascular Emergencies,
Continuing Medical Education for Physicians
Med-Challenger for Emergency Physicians
Challenger Corporation, Memphis, TN, 2000.

Sobel RM, Morgan BW: Ketamine in the emergency department: Medical politics vs. patient care
*American Journal of Emergency Medicine 17(7):722-725, 1999 Nov.*

Sobel RM, Fuller R, Simons M: Pneumoperitoneum secondary to coelomic-fallopian fistula.
*American Journal of Emergency Medicine, 17(3):310-311, 1999 May.*

Sobel RM: Ruptured retroperitoneal aneurysm in a patient taking phentermine.
*American Journal of Emergency Medicine, 17(1):102-103, 1999 Jan.*

Sobel RM: In case of emergency…The role of the emergency room in asthma management.
*Asthma, 5(1):18-20, 2000.*

Sobel RM:  Corticosteroids for controlling asthma.
*Asthma, 4(4):27-29, 1999.*

Sobel RM: The Emergency X-Ray: Incarcerated Diaphragmatic Hernia
*Emergency Medicine 31 10:111-112, 1999 Oct.*

Sobel RM: Asthma Diagnosis and Management, *Clinical Bulletin: State of the Art Emergency Medicine 4 1: 1-15, 1998.*

Sobel, RM (Editor): Revised AMA/HCFA Documentation guidelines for evaluation and management
services: A self-directed CME activity. 1998.
Sterling Healthcare Group,
Miami, FL.

Hackeling T, Damos A, Sobel RM, et al: Emergency care pathway for patients with acute asthma,
1998 ED Performance Improvement Manual pp. 64-76.
Sterling Healthcare Group,
Miami, FL.

Hackeling T, Sobel RM: Management of patients with acute asthma, *Clinical Bulletin,
State of the Art Emergency Medicine 3 10:1-12, 1998.*
Sterling Healthcare Group,
Miami, FL.

Sobel RM, Layon AJ: Physician Assisted Suicide: Compassionate Care or Brave New World, Editorial.
*Archives of Internal Medicine 157(15):1638-1640, 1997 Aug 11-25.*

Middleton DM: Tricks of the trade: Allergy kit emergency. (Citation)
*Emergency Medicine 30:105, 1998.*

Sobel RM, Sweeney RE:  Alabama EMS:  The state of the state 1993.
*Healthcare Alabama 6:12-13, 1993.*

Sobel RM:  Untoward reaction to adenosine therapy for supraventricular tachycardia.
*American Journal of Emergency Medicine 10(4):393, 1992 Jul.*

Sobel RM:  Bystander cardiopulmonary resuscitation:  the next decade.
*American Journal of Emergency Medicine 9(1):88, 1991 Jan.*

Newquist MJ, Sobel RM:  Traumatic asphyxia: an indication of significant pulmonary injury.
*American Journal of Emergency Medicine 8(3):212-215, 1990 May.*

Sobel RM:  Editorials.
Citizen CPR Newsletter, 2:1-2, Winter Haven, FL 1989.
Citizen CPR Newsletter 3:1, Winter Haven, FL 1990.

Sobel RM:  Emergency department physicians: from nomadic times to the present.
*American Journal of Emergency Medicine 7(6):666-667, 1989 Nov.*

Cuomo MD, Sobel RM:  Concrete impaction of the external auditory canal.
 *American Journal of Emergency Medicine 7(1):32-33, 1989 Jan.*


**BOARD CERTIFICATION**

American Board of Emergency Medicine,
Certified 1985, Fellow 1988, Recertified 1996, 2006, 1/1/17-12/31/26


**ACTIVE LICENSURE**

Georgia 24100 4/27/16- 4/30/19
Florida 45942 12/29/19-1/31/19

**FOREIGN LANGUAGE PROFICIENCY**

Spanish

 **CONTACT INFORMATION:**
Cell: (404)723-2721, Fax: (678)519- 4089, Email: rsobel@aol.com.