# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JUDY LYNN PRINCE,<br>**Administrator of the Estate of**<br>**WAYNE BOWKER, Deceased,**<br><br>Plaintiff,<br><br>v.<br><br>**SHERIFF OF CARTER COUNTY,**<br>**in his official capacity, et al.,**<br><br><br><br><br><br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. CIV-18-201-RAW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Before the court is the motion of defendant Kimberly Miller for summary judgment.[1] Wayne Bowker ("Bowker") began incarceration in the Carter County Detention Center ("CCDC") on March 23, 2016 while awaiting trial for possession of cocaine. He died in custody on June 30, 2016. At the time of Bowker's incarceration, Miller was employed as a nurse employed by the CCDC. Plaintiff brings claims against her pursuant to 42 U.S.C. §1983, the "remedial vehicle for raising claims based on the violation of [federal] constitutional rights." *Brown v. Buhman,* 822 F.3d 1151, 1161 n.9 (10th Cir.2016).

Summary judgment is appropriate "if the movant shows that there is no genuine

---

[1] The complaint spells defendant's name thus. In the briefing, the spelling "Kimberlee" is sometimes used.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) F.R.Cv.P.  A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party; a fact is material when it might affect the outcome of the suit under the governing substantive law.  *See Bird v. W. Valley City,* 832 F.3d 1188, 1199 (10th Cir.2016).  The court must view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Sawyers v. Norton,* 962 F.3d 1270, 1282 (10th Cir.2020).

The court will relate the facts generally, although the task has been difficult.  First, plaintiff has not strictly complied with Rule 56 and Local Civil Rule 56.1(c).  *See Bennett v. Carter County,* 2019 WL 1671979 n.2 (E.D.Okla.2019)(describing similar lack of compliance).  For her part, defendant has <u>asserted</u> what medical records state in support of her statement of undisputed facts.  The actual medical records themselves, however, are often not presented.  Instead, throughout much of movant's principal brief, movant cites to the deposition [#35-2] of Bowker's mother (the plaintiff in this case) in which pertinent portions of medical records (or other documents) were <u>read</u> to her by counsel.  This is not an appropriate presentation either.[2]

---

[2] By way of example of the difficulty, movant asserts "Bowker's medical records show he had previously been diagnosed as having cardiomegaly, or an enlarged heart." (#135 at page 7 of 30 in CM/ECF pagination, ¶3).  Movant cites to the deposition transcript and #135-11, which was evidently an exhibit during the deposition.  The exhibit does not support the statement, although the witness agreed (without contemporaneous objection) that the exhibit she was shown so stated.  Plaintiff asserts in her response brief "Defendant provides no competent evidence that

2

Upon initial booking on March 23, 2016, Bowker identified various medical conditions (asthma, a heart condition, high blood pressure, bipolar disorder, an anxiety disorder, seizures, and shortness of breath.) He did not mention that he used a CPAP machine at night. He did not mention any history of cardiomegaly (enlarged heart). "Jail policy at all relevant times stated that medical care was to be delivered by a licensed physician and through the use of trained health care personnel . . . However, Carter County Jail had no licensed physician on staff, and instead had hired licensed registered nurse Kim Miller. She did not regularly review medication logs, although she had access to the logs and the Jail Entry Log." *Bennett,* 2019 WL 1671979 at *2.[3] Nurse Miller also had no specific mental health training. (#152-7

---

Bowker was previously diagnosed with 'cardiomegaly.'" (#153 at page 6 of 30, ¶¶2-3). Upon the court's review, an exhibit to another defendant's motion for summary judgment (#136-5) is a medical record indicating Bowker had cariodmegaly in 2015. This court takes judicial notice. *See Murphy v. Sandoval Co.,* 2019 WL 8881629 n.1 (D.N.M.2019).

On another occasion, defendant presents as an undisputed material fact that "[d]uring a telephone conversation with Bowker on May 3, 2016, Plaintiff told him she was trying to sort out his medication and he told her 'don't even worry about it, it's not that big a deal.'" (#135 at page 9 of 30, ¶11). Citation is again made to the deposition, in which counsel reads the purported statement by Bowker. The court does not adopt this asserted undisputed fact.

[3]The *Bennett* decision deals with somewhat similar claims involving the CCDC and an inmate named Michael Manos. Miller was not a party to that case. Plaintiff in the case at bar seeks to rely on the language that "Nurse Miller failed to do anything with regard to Manos' treatment or care, including never reviewing the medication logs or assessing Manos." *Id.* at *14. In context, the statement is reciting plaintiff's contentions in that case, and this court does not view it as a factual finding.

at page 7 of 22, ll.11-20).

Because Miller was not a doctor, she could not prescribe medications. Therefore, to be administered a prescription, a prisoner either needed to bring the medication with him when he was booked or the family needed to bring in the medication (and only in sealed "blister packs"). Obviously, this led to inconsistent administration of medications. Alternatively, the CCDC effectively "outsourced" the problem by sending the inmate to the Emergency Room, where the ER physician could order a prescription.

On April 13, 2016, Bowker completed a Medical Request Form. He complained that he was having a difficult time breathing at night, saying he did not have his "pills or my air." Miller received the form on April 15, 2016. She determined that Bowker needed a CPAP machine and made contact with Bowker's mother for delivery. Miller instructed officers to transport Bowker to the Emergency Room, but Bowker refused to go.

After delay, Bowker's medications were delivered to the CCDC, beginning on May 13, 2016. Some prescriptions terminated in June, 2016 and others Bowker began refusing to take. The parties have devoted some portion of their briefing to the issue of medicine. This is a serious issue regarding the operation of the jail itself. In the case at bar, however, plaintiff's expert does not state the failure to receive or the refusal to take medication caused or contributed to Bowker's death. (#135-6 at pages 42-43 of 52).[4]

---

[4] Plaintiff's expert does make the general statement that "the failure to provide medical care resulted in [Bowker's] death within reasonable medical certainty," (*Id.* at page 43 of 52, ll.12-15), but addresses provision of specific medications as a

4

On May 18, 2016, Bowker had a rash and was sent by CCDC staff to the Mercy Hospital Emergency Room.  He was treated and discharged.  Bowker submitted medical request forms complaining of loss of balance and dizziness on May 28, 2016 and June 3, 2016.  Miller believes she was on vacation and did not see the forms until June 6, 2016.  Upon seeing the forms, she immediately sent Bowker to the Emergency Room again.  The ER doctor concluded Bowker was getting too much of one of his medications and lowered the dosage.  Movant represents that the ER doctor concluded: "at this time, I feel the patient is safe for discharge.  Symptoms have improved."  Again, this statement was <u>read</u> to plaintiff during her deposition, but she appeared to concur that the reading was accurate.  (#135-2 at page 43 of 57, ll.19-24).[5]

On June 11, 2016, Bowker was sent to the Mercy Hospital Emergency Room a third time, this time with complaints of chest pain.  He again was treated and released.  Miller was advised that Bowker was acting helpless and defecating on himself, and she went to check on him on June 29, 2016.  She asked him why he was defecating on himself and he responded "I can't.  I can't."[6]  Miller did not believe Bowker needed to be transported to the

---

discrete issue.

[5] The record does reflect an ER physician's observations (on 6/11/2016) that "This could all be psychosomatic" and "I do not feel that [Bowker] needs an emergent neurological evaluation." (#142-7 at page 8 of 13).

[6] There is testimony that Bowker defecated on himself on "about" a daily basis for "the last week or two" he was at the jail. (#152-15 at page 5 of 12, ll.10-23). Miller interpreted the fecal incontinence as possibly related to Bowker's bipolar disorder, but not as an emergency. (#135-4 at pages 31-32 of

5

ER at that time because his behavior did not appear to be life-threatening. (#135-4 at page 30 of 34, ll.1-4). An officer reported later that day that Bowker stood and walked to get his food tray, ate his food, and even asked other inmates for additional food.

On June 29, Miller called Judge Carson Brooks, who had presided over a competency hearing for Bowker a few days earlier. Miller was exploring whether to get Bowker released early from the CCDC so that he could obtain additional medical treatment. Judge Brooks told Miller that Bowker had appeared normal in his court appearance.

On June 30, 2016, at 1:02 a.m., a detention officer conducted a "site check" (or perhaps "sight check") and saw Bowker sitting on the toilet, looking up at the detention officer. Upon a second check at 2:09 a.m., an officer found Bowker unresponsive. CPR was performed and an ambulance was called. Bowker was transported to the ER, where he was pronounced dead at 2:55 a.m.

Plaintiff's expert asserts Bowker "didn't die of caridiomegaly." (#152-16 at page 18 of 19, l.25). He found the cause of death to be "multifactorial." (#135-6 at page 11 of 52, l.6).[7] The various possibilities he explores are adequately summarized by movant. *See* #135

---

34). Plaintiff's expert opines that it should have obvious Bowker needed "psychiatric stabilization and medical evaluations." (#152-16 at page 16 of 19, ll.14-16), although plaintiff's expert does not frame this observation directly as to Miller.

[7]The question posed was "what was the cause of death for Mr. Manos?" (i.e., the inmate in the *Bennett* litigation), but the expert clarified he was answering as to Bowker. (*Id.* at page 14 of 52, ll. 14-16).

at pages 12-13 of 30, ¶30.[8]  The expert opined that the jail staff "did good" in sending Bowker to the ER three times within a six-week period (#135-6 at page 48 of 52 ll.17-20) but that the staff was "deliberately indifferent to the need for access to medical screening and emergency stabilization by the 29th and very likely prior.  I just don't have enough data." *Id.* at ll. 12-15).

In this case, Miller asserts qualified immunity.  Where a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established. *Kapinski v. City of Albuquerque,* 964 F.3d 900, 905 (10th Cir.2020).  If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment. *Id.*  When a defendant has moved for summary judgment based on qualified immunity, the court still views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in its favor. *Henderson v. Glanz,* 813 F.3d 938, 952 (10th Cir.2015).

As to the second prong, a clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he or she is doing violates that right. *Quintana v. Santa Fe Bd. of Comm.,* 2020 WL 5087899, *5 (10th Cir.2020).  Although courts do not require a case directly on point, nonetheless existing precedent must have

---

[8] Plaintiff states "Defendant misstates Dr. Sobel's opinions" (#153 at page 17 of 30, ¶30) but does not so demonstrate.  See also #161 at pages 4-5 of 12.

placed the statutory or constitutional question beyond debate. *Id.* The dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established. *Id.* at *6 (emphasis in original). Such an inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.*

The Tenth Circuit has stated that "there is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Mata v. Salz,* 427 F.3d 745, 749 (10th Cir.2005). This abstract language calls to mind the principle that a clearly established right should not be defined at a high level of generality. *See White v. Pauly,* 137 S.Ct. 548, 552 (2017). In *Estate of Vallina v. Petrescu,* 757 Fed.Appx. 648 (10th Cir.2018), the court stated "[t]his general recitation of the deliberate indifference standard cannot provide a source of clearly established law that controls in this case because the statement of law is insufficiently particular to the facts at hand." *Id.* at 650. *See also Toler v. Troutt,* 631 Fed.Appx. 545, 547 (10th Cir.2015)("If such a general statement of the constitutional violation that must be clearly established were sufficient, qualified immunity would almost never be granted.").

Rather, the pertinent statement appears to be that it is clearly established that a deliberate indifference claim will arise when a medical professional <u>completely</u> denies care although presented with recognizable symptoms which potentially create a medical emergency and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell. *See Al-Turki*

*v. Robinson,* 762 F.3d 1188, 1194 (10th Cir.2014).

The court concludes that plaintiff has failed to meet her burden of demonstrating the existence of a clearly established right. Miller did not completely deny care but, on the contrary, sent Bowker to the ER on three separate occasions. Bowker's final decline seems to have been rapid, taking place over 24-48 hours, and manifesting itself (even in previous days) in fecal incontinence. The court agrees with movant that "there was no clearly established constitutional or statutory right that would have required a medical professional to immediately transfer an inmate exhibiting symptoms of mental illness to the hospital." (#161 at 9).

In the interest of thoroughness, the court now "considers whether the facts taken in the light most favorable to plaintiff show that the defendant's conduct violated a constitutional right." *Poolaw v. Marcantel,* 565 F.3d 721, 728 (10th Cir.2009). Elementary principles of humanity embodied in the Eighth Amendment establish the government's obligation to provide medical care for those whom it is punishing by incarceration. *Chapman v. Santini,* 805 Fed.Appx. 548, 553 (10th Cir.2020). Prison officials betray that obligation by acting with deliberate indifference to an inmate's serious medical needs. *Id.*

Deliberate indifference has both an objective and a subjective component. *Id.* To satisfy the objective component, a prisoner must prove that the alleged deprivation was sufficiently serious. *Id.* The subjective component requires that a defendant act with a sufficiently culpable state of mind. *Id.* A defendant has the necessary state of mind if he or

she knew an inmate faced a substantial risk of harm and disregarded that risk. *Id.* An inmate need not prove the defendant had actual knowledge of the danger or actually intended that harm befall the inmate. *Id.* Rather, it is enough that circumstantial evidence supports an inference that a defendant failed to verify or confirm a risk that he or she strongly suspected to exist. *Id.* Medical care includes psychological and psychiatric care. *Holden v. GEO Group Private Prison Contractors,* 767 Fed.Appx. 692, 694 (10th Cir.2019).

Bowker was a pretrial detainee. The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause. *Sawyers,* 962 F.3d at 1282. In evaluating such claims, the court applies the analysis identical to that applied in Eighth Amendment cases. *Id.*[9]

Stated at a high level of generality, deliberate indifference to an inmate's serious medical need violates a clearly established constitutional right. *Estate of Booker v. Gomez,* 745 F.3d 405, 433 (10th Cir.2014). This principle also clearly applies to pretrial detainees through the Due Process Clause of the Fourteenth Amendment. *Id.*

---

[9] In *Kingsley v. Henrickson,* 576 U.S. 389 (2015), the Supreme Court held that the Eighth Amendment standard for excessive force claims brought by prisoners, which requires that defendants act maliciously and sadistically to cause harm, does not apply to Fourteenth Amendment excessive force claims brought by pretrial detainees. The circuits are split on whether *Kingsley* alters the standard for conditions of confinement and inadequate medical care. Plaintiff asks this court to rule that it does. Absent a Tenth Circuit decision applying *Kingsley* to inadequate medical care claims, this court will continue to apply existing precedent. *See, e.g., Parks v. Taylor,* 2020 WL 1271587 (W.D.Okla.2020).
    Even should *Kingsley* be applicable, the court does not find movant's actions were "objectively unreasonable."

Regarding the objective component, a medical need is considered sufficiently serious to satisfy this prong if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Sawyers,* 962 F.3d at 1283. Precision is required because "[h]ow the sufficiently serious medical need is defined will affect whether a defendant's deliberate indifference was the cause of that harm." *Paugh v. Uintah County,* 2020 WL 4597062, *24 (D. Utah 2020).[10] The case at bar, however, is marked by lack of precision on this point. In her opening brief, defendant states "it is not entirely clear what harm the Plaintiff has identified to satisfy" this component. (#135 at page 20 of 30 in CM/ECF pagination).

The Tenth Circuit has spoken of the "ultimate harm" being sufficiently serious. *Martinez v. Beggs,* 563 F.3d 1082, 1088-89 (10th Cir.2009). If that is the defined harm in the case at bar, the question is easily answered by noting that Bowker ultimately died. The Tenth Circuit holds that death "[is], without doubt, sufficiently serious to meet the objective component." *Burke v. Regalado,* 935 F.3d 960, 962 (10th Cir.2019). That defined harm, however, places the heavy burden on plaintiff to demonstrate that Miller was deliberately indifferent to the risk that Bowker would die.

On the other hand, the Tenth Circuit has also said the serious medical need test can be met by the "intermediate harm," considering the inmate's symptoms "presented at the time

---

[10]The risk prison officials ignored must be the risk plaintiff claims. *Bruner-McMahon v. Jameson,* 566 Fed.Appx. 628, 633 (10th Cir.2014). Accordingly, the burden of specificity is on the plaintiff.

the prison employee has contact with the prisoner" or by the resulting harm, when (for example) "delay by prison officials results in damage to a prisoner's heart" or death. *Kellum v. Mares,* 657 Fed.Appx. 763, 771 (10th Cir.2016).

Plaintiff presents somewhat of a moving target, citing psychosis, fecal incontinence, death, and respiratory distress. (#153 at page 19 of 30 n.6). Plaintiff also notes that her expert "opines, to a reasonable degree of medical certainty, that [the] proximate cause of Bowker's death was neglected severe acute psychosis or delirium that caused an acute encephalopathy, with a number of contributory comorbidities," which are listed. (*Id.* at page 16 of 30). In the same paragraph, the plaintiff's expert is cited for the opinion that "Mr. Bowker suffered an acute psychiatric decompensation and catatonia that <u>became</u> lethal due to the failures to provide inmate psychiatric and medical care and access to emergency services." *Id.* (emphasis added).

The court finds that the objective component is satisfied, but with caveats. This prong is satisfied if the defined harm (as claimed by plaintiff) is death, which is "sufficiently serious" to satisfy this prong. Death satisfies this prong by either being characterized as "ultimate harm" or as "resulting harm." The court finds plaintiff has not satisfied the objective component under the "intermediate harm" analysis, because the symptoms Mr. Bowker presented upon initial booking and during his incarceration did not put jail employees on notice that Mr. Bowker would suffer death.[11]

---

[11]On the other hand, a medical need is considered sufficiently serious to satisfy the objective prong if the

The subjective component is akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm. *Bennett v. Carter Co.,* 2019 WL 1671979, *5 (E.D.Okla.2019). Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Id.* The fact that a serious medical need was "obvious" could be evidence of deliberate indifference, although a prison official may show that the obvious escaped him and avoid liability. *Id.*

Largely for reasons previously stated, the court finds the subjective prong is not satisfied. Miller had previously sent Bowker to the ER on three separate occasions. She believed his fecal incontinence was a symptom of his bipolar disorder, and there is no evidence she believed she was confronted with impending death. The Tenth Circuit has found deliberate indifference when jail officials confronted with serious symptoms took no action to treat them. *See Sawyers,* 962 F.3d at 1283. Such is not the situation here. Miller made a good faith effort to diagnose and treat Bowker's medical condition. *See Mata,* 427 F.3d at 761. Movant is also entitled to qualified immunity based upon the first prong, lack of a constitutional violation.

Plaintiff also brings a claim for unconstitutional conditions of confinement. Again,

---

condition has been diagnosed by physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Al-Turki*, 762 F.3d at 1192-93. That Bowker's symptoms could lead to death had not been diagnosed by a physician and was not obvious to a lay person.

as a pretrial detainee, plaintiff's protections against inhumane conditions are based on the Due Process Clause of the Fourteenth Amendment, but the Eighth Amendment standard provides the benchmark for such claims. *See Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir.1998). A pretrial detainee must be afforded humane conditions of confinement by ensuring basic necessities of adequate food, clothing, shelter, and medical care and reasonable measures to guarantee safety. *Ledbetter v. City of Topeka,* 318 F.3d 1183, 1188 (10th Cir.2003). Prison officials violate this standard when they are deliberately indifferent to an inmate's serious medical needs. *See Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir.2000).

Miller asserts qualified immunity as to this claim as well. The court employs the same analysis described above and finds plaintiff has failed to demonstrate both (1) violation of a constitutional right and (2) that the constitutional right (stated at the proper level of specificity) was clearly established.

In the alternative, movant seeks dismissal of the punitive damages claim against her. The substantive claims being dismissed, this claim too is necessarily dismissed.

It is the order of the court that the motion of Kimberly Miller for summary judgment (#135) is hereby granted.

**IT IS SO ORDERED** this 21st day of SEPTEMBER, 2020.

*Ronald A. White*
Ronald A. White
United States District Judge
Eastern District of Oklahoma